# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 22-0826V**

| | |
|---|---|
| PHILLIP R. SIMS,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: September 16, 2026 |

*Kirk Tripp Otto, Siri & Glimstad, LLP, Richmond, VA, for Petitioner.*

*Ryan Pohlman Miller, U.S. Department of Justice, Washington, DC, for Respondent.*

## FINDINGS OF FACT[1]

On July 29, 2022, Phillip R. Sims filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a left shoulder injury related to vaccine administration ("SIRVA") from a tetanus, diphtheria, and acellular pertussis ("Tdap") vaccine he received on September 29, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

[1] Because this unpublished Fact Ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

After a review of the record and other filings, and for the reasons set forth below, I find that the onset of Petitioner's left shoulder pain likely began within the 48-hour timeframe required to establish a Table SIRVA claim.

## I. Relevant Procedural History

Mr. Sims filed his Petition along with medical record exhibits from July to October 2022. (ECF No. 1, 6-11). After spending nearly 22 months attempting to informally resolve this case, on July 29, 2024, Respondent filed his Rule 4(c) Report contesting entitlement. (ECF No. 37). Respondent specifically argued in the Rule 4(c) Report that Petitioner had not established that the onset of his shoulder pain began within 48 hours after receiving the Tdap vaccine on September 29, 2020. Respondent's Report at 10-12. The parties subsequently filed briefing requesting a ruling on onset. My ruling is set forth below.

## II. Relevant Factual History

On September 10, 2020, Mr. Sims received a seasonal flu vaccine in his left deltoid at CVS. Ex. 20 (ECF No. 28-1) at 3. Nineteen days later, on September 29, 2020, Mr. Sims received a Tdap vaccine (the vaccine at issue) in his left shoulder during an urgent care visit to MD Now Urgent Care after cutting his hand. Ex. 3 at 9; *see also* Ex. 3 at 7-10. At the time, Petitioner was 70 years old, retired, and an avid golfer. Ex. 1 at 1.

In his sworn declaration, Mr. Sims states the following:

> On September 30, 2020, at 9:00 am when I woke up, immediately, as I always get out of bed on my left side, my left arm would not move off the bedsheets. I could not push myself up out of bed as normal, I had to use my right arm to push me to the left an droll out of bed, startled of what was wrong with my left arm. My left shoulder was somewhat sore but not free of normal movement, which was very scary. I got dressed immediately [and] went back to the MD Now to see the doctor. He examined me and said don't worry, this is going to be okay, go home and ice it for 20 minutes on then off as often as you can. It should be fine in a few days. I continued this icing process and after a week of no improvement, I felt I should see another doctor, like an orthopedist.

Ex. 1 at 1-2. In his supplemental affidavit, Mr. Sims stated that when that he returned to urgent care the next day, September 30, 2020, to complain of left shoulder pain, his "left arm [was] hanging down and unable to raise my left hand from my side. Then it was clear [the pharmacist] remembered the case. I had asked him to make a written statement to this affect and he said he would, only if his supervisor would permit him to do that and he

would call me within a week to let me know. He never called nor did he take my follow up calls." Ex. 41 at 1.

On November 13, 2020 (46 days after vaccination), Mr. Sims saw Michael Krantzow, D.O., an orthopedist, with a "new [complaint of] left shoulder pain for about [six] weeks." Ex. 4 at 59-60. Dr. Krantzow noted the pain had a "gradual onset following recent flu shot and tetanus shot to his right [sic] shoulder. Pain with abduction and sleep positions." *Id.* Petitioner's left shoulder examination showed tenderness over the proximal humerus and subacromial space, positive Hawkins and Neer tests, and a positive impingement sign. *Id*. Petitioner underwent a left shoulder x-ray, which was normal. *Id*. at 60. Dr. Krantzow diagnosed Mr. Sims with impingement syndrome of the left shoulder and recommended conservative treatment with activities as tolerated. *Id*. Petitioner was advised to use NSAIDs and ice as needed, and Naprosyn was prescribed.

On November 19, 2020, Mr. Sims submitted a VAERS report, which was filled out by an employee of CVS and detailed left arm pain following the *flu vaccine* Mr. Sims received in his left deltoid on September 10, 2020, at CVS (not the subject Tdap vaccine he received nearly three weeks later). *See* Ex. 19. In his motion, however, Mr. Sims contends that the CVS employee failed to mention the Tdap vaccine despite Petitioner having reported its receipt. Mot. at 6-8. That VAERS report described Mr. Sims's report of "pain in deltoid while swinging golf club or laying down for weeks after vaccine." *Id*. at 3.

On December 23, 2020, Mr. Sims saw Dr. Krantzow for treatment of continued left shoulder pain and reported "difficulty with [activities of daily living ("ADLs")] due to pain." Ex. 4 at 56. On exam, Mr. Sims had reduced range of motion of the left shoulder and tenderness over the proximal humerus and subacromial space, as well as decreased strength of the left rotator cuff complex. *Id*. at 56-57. His Hawkin's and Neer's impingement tests were positive. *Id*. at 57. Dr. Krantzow ordered an MRI and recommended that Petitioner continue activities as tolerated, engage in an exercise program, and use NSAIDs and ice as needed. *Id*.

On December 29, 2020, Mr. Sims had a telehealth visit with Michael Perelman, M.D., an internist, for complaints of left shoulder pain. Ex. 5 at 9-12. Petitioner reported that he had "persistent left shoulder pain," and that "[physical therapy ("PT")] ha[d] not helped." *Id*. at 9. Dr. Perelman prescribed a Medrol dosepak. *Id*. at 12. He also noted the left shoulder pain had "unspecified chronicity." *Id*. at 11.

On March 5, 2020, Mr. Sims underwent a left shoulder MRI, and the impression was "mild acromioclavicular arthritis; mild bursal surface fraying of the anterior rotator cuff with mild tendinitis with no tear; mild glenohumeral arthritis; and mild glenohumeral capsular sprain versus mild capsulitis." Ex. 6 at 1.

On March 10, 2021, Mr. Sims returned to see Dr. Krantzow, who reviewed the MRI report and administered a subacromial steroid injection into Petitioner's left shoulder. Ex. 4 at 52-54. During this visit, Mr. Sims reported "worsening pain and limited motion at his left shoulder." *Id*. at 52.

The next day, Mr. Sims had his annual wellness check with Dr. Perelman. Ex. 5 at 4-7. Dr. Perelman recorded Petitioner's left shoulder pain but did not specify an onset or duration, noting "left shoulder pain, unspecified chronicity." *Id*. at 6-7. He further noted, "recent MRI was negative for rotator cuff tear. Patient was recommended for PT, by Orthopedic Surgery." *Id*.

On March 17, 2021, Mr. Sims went to Golden Orthopaedics for an initial physical therapy ("PT") evaluation for his left shoulder pain, weakness, decreased range of motion ("ROM"), and difficulty with ADLs. Ex. 4 at 48-49. He reported "worsening pain and limited motion at his left shoulder." *Id*. Mr. Sims rated his pain at 0/10 at rest and 8/10 with forced reaching activities, "to lateral right shoulder area going towards his elbow." *Id*. Petitioner described his pain as an "aching pain," and stated it impacted his ability to sleep at night. *Id*. Mr. Sims reported his steroid injection had relieved his discomfort to "a degree," but complained that he still had difficulty putting on his belt and playing golf. *Id*. An examination of Petitioner's left shoulder showed range of motion deficits, positive Hawkins and Neer tests, and a positive impingement sign. *Id*. at 49.

On March 22, 2021, Mr. Sims had his second PT visit for left shoulder pain and noted that he had been "performing his stretching activities," with "good improvement." *Id*. at 45. Petitioner's left shoulder symptoms slowly improved with PT over18 sessions through July 15, 2021. *See id*. at 5-42, 70-78. (During his final PT visit on July 15, 2021, Mr. Sims had, "slow, but very good progress" but still had trouble "lift[ing] heavy stuff high up." *Id*. at 67-69).

On March 31, 2021, Mr. Sims saw Armand Rodriguez, M.D., an internist, for left shoulder pain and limited ROM. Ex. 7 at 20-22. Petitioner described his left shoulder issue as "frozen shoulder," and reported his symptoms improved with PT, that he wasn't taking any pain medication, but that the pain interfered with his sleep. Id. Dr. Rodriguez recommended that Mr. Sims continue with PT and follow up with orthopedics. *Id*. at 22.

On April 21, 2021, Mr. Sims returned to Dr. Krantzow for treatment of left shoulder and left-hand pain. Ex. 4 at 39-41. Petitioner reported improvement of his left shoulder function with PT, and noted he was engaging in a home exercise plan with ongoing relief. *Id*. at 39. Petitioner complained of increased sensitivity to the medial side of his left ring finger "following the original injury." *Id*. His left shoulder examination revealed tenderness to palpation over the proximal humerus and subacromial space, positive Hawkin's and Neer tests, and positive impingement signs. *Id*. at 40. Dr. Krantzow's diagnosis was pain

in the left shoulder, impingement syndrome of left shoulder, and pain of the left-hand joints. *Id*. at 41. Dr. Krantzow advised Mr. Sims to continue activities as tolerated, continue his exercise program and PT, and use NSAIDs and ice as needed. *Id*.

From April 2021 to June 2022, Mr. Sims had several visits for a variety of medical issues during which there is no mention of left shoulder pain or dysfunction contained within the notes. *See* Ex. 17 at 3 (April 8, 2021 dermatology follow-up); Ex. 7 at 11-13 (April 9, 2021 bilateral carotid doppler duplex ultrasound and brain MRI); Ex. 7 at 9 (April 30, 2021 visit with Dr. Rodriguez); Ex. 11 at 41-44 (May 20, 2021 visit with Joshua Larned, M.D., a cardiologist for fatigue and a history of heart murmur and to establish care and an ECG); Ex. 7 at 7 (June 1, 2021 telehealth visit with Dr. Rodriguez for sleep apnea); Ex. 12 at 23 (June 9, 2021 neurology visit for issues with memory); Ex. 11 at 32-34 (June 22, 2021 cardiology follow-up); Ex. 12 at 7 (July 8, 2021 neurology telemedicine follow-up); Ex. 18 at 63, 61, 54, 42, 25, 9 (July 21, 2021, July 23, 2021, August 4, 2021, August 25, 2021, September 23, 2021, and December 2, 2021 pulmonology visits); Ex. 17 at 8, 13, and 19 (October 14, 2021, May 13, 2022 and June 3, 2022 dermatology follow-ups).

On June 21, 2021, and July 5, 2021, Mr. Sims saw Allan Ribbler, Ph.D., neuropsychologist, at the Neurobehavioral Health Institute for a neuropsychological evaluation, having been referred for problems with memory and other cognitive functions. Ex. 12 at 9. Mr. Sims reported that in his free time he enjoyed golf and "working in his yard." *Id*. When asked about his shoulder symptoms, he reported range of motion issues in his left shoulder due to frozen shoulder. *Id*. at 10. Petitioner did not file records of medical care beyond May 13, 2022.

In his sworn declaration, Mr. Sims claimed he was "mostly retired" at the time of vaccination but was still working as a realtor. Ex. 1 at 1. He indicated that pre-vaccination, he played golf four times a week and was active. *Id*. Mr. Sims described the onset of his pain as being the morning after receiving a Tdap vaccine on September 30, 2020. *Id*. He states that he still has restricted movement in his left arm and is unable to lift his arm to loop his belt around his left side. *Id*. at 2. Petitioner claimed that as of the time he signed his declaration, on July 28, 2022, nearly two years after vaccination, he was 75-85% back to normal. *Id*. at 3.

Petitioner's wife, Susan Mawyer Sims, also submitted a sworn declaration, in which she described the onset of Mr. Sims's pain and the impact it has had on their relationship. *See* Ex. 2. Ms. Sims stated that Petitioner complained, immediately upon his return from the visit at which he received his Tdap vaccination, that it had been administered too high and that he was sore. *Id*. at 1. While she stated he assumed it would improve by the next day, she claimed that, instead, it worsened. *Id*.

With his Motion and Brief, petitioner filed a Supplemental Affidavit (a sworn declaration), ECF No. 41-1, and photographs, ECF NO 41-2. In his Supplemental Affidavit, Mr. Sims explained that he tried to get documentation of his September 30, 2020 visit to MD Now Urgent Care, but was unable to do so. ECF No. 41-1. The photographs show Mr. Sims in three different poses, on February 24, 2021. ECF No. 41-2.

## III. Issue

The following issue is contested: whether Petitioner's first symptom or manifestation of onset after vaccine administration (specifically pain) occurred within 48 hours as set forth in the Vaccine Injury Table and Qualifications and Aids to Interpretation ("QAI") for a Table SIRVA. 42 C.F.R. § 100.3(c)(10)(ii)-(iii) (required onset for pain listed in the QAI).

## IV. Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act § 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. § 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19.

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs*., 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that

happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs*., 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs*., No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). However, the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." § 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## V. Findings of Fact

The Vaccine Injury Table lists SIRVA as a presumptive injury for injectable vaccines, including Tdap vaccine, if the first symptom or manifestation of onset of the injury occurs within 48 hours of an intramuscular vaccine administration. See 42 C.F.R. § 100.3(a)(II)(C). As discussed below, I find that the filed evidence (which includes both medical records and Petitioner's witness statements) preponderates in favor of the conclusion that onset of his injury likely occurred close-in-time to vaccination.

Respondent has raised a concern regarding the length of time after vaccination that the injury is first documented in the medical records. However, I do not find 46 days to be a problematic amount of time to wait after shoulder pain has developed after vaccination, as most people expect some sort of shoulder pain after vaccination, and know that they will likely be told to wait for the pain to dissipate if they do see a medical professional.

Next, Respondent argues that the VAERS report that Mr. Sims describes an onset of "September 11, 2020, eighteen days before his tdap vaccine… Notably, in that report, petitioner attributed his shoulder pain to his September 10,2020 flu vaccination, which not the vaccination that is the subject of this case." Opp. at 12. However, it is evident from the VAERS report that it was completed by the "healthcare professional/staff" at CVS and not by Mr. Sims. Ex. 19 at 1. Nowhere on this form is it indicated that Mr. Sims reviewed the information, nor is his signature contained in the VAERS report. Because Mr. Sims received both the flu and Tdap vaccines in September 2020, it is very possible that the healthcare professional simply assumed that the vaccination at issue was the flu vaccine. And Mr. Sims has sworn in his declaration that he reported to the pharmacist that it was the Tdap vaccine that caused his injury. *See* Ex. 1, 41.

Finally, Respondent argues that Mr. Sims's treating physicians "also repeatedly recorded an unspecified and gradual onset of that pain, and that the pain started with his flu, not his Tdap, vaccination." Opp. at 12. While it is true that there are some indications that the onset of pain was "gradual" and there was "unspecified chronicity," this in no way contradicts Mr. Sims's report of a 0–48-hour onset of shoulder pain after his Tdap vaccination. And the fact that both the flu and Tdap vaccine were referenced in one of the physician's reports does not negate Petitioner's argument that his left shoulder pain began after his September 29, 2020 Tdap vaccination.

There is no dispute that Mr. Sims did not suffer from any left shoulder symptoms in the three years prior to receiving the Tdap vaccine on September 29, 2020. In fact, it is likely Mr. Sims did not suffer any left shoulder pain after receipt of the flu vaccine on September 10th because he received the Tdap vaccine in the same left shoulder just two weeks later – and there is no record evidence of pain concerns in that intervening timeframe. I also credit Mr. Sims's statement in his sworn declaration that he reported right shoulder pain to the healthcare employee at CVS a day after his September 29, 2020 vaccination, but that his complaint was not documented, and he was just told to ice his arm and that his pain should subside in a few days.

Another factor that weighs in favor of a finding of 48-hour onset left shoulder pain is that at Mr. Sims's first medical visit reporting left shoulder pain (on November 13, 2020), the orthopedist notes a "new complaint of left shoulder pain for about [six] weeks" – which

would place onset at approximately October 3, 2020 (within a few days of receipt of the Tdap vaccine). While this statement does not clearly reflect 48-hour onset of shoulder pain, it is the most contemporaneous record after vaccination and approximates *close enough* to the date of Petitioner's relevant vaccination to be consistent with Petitioner's contentions.

There is no question that the evidence of a Table-consistent onset is not strong, and presents a close call. But in deciding these kinds of matters, I must review the evidence in its entirety and make a factual finding based on the preponderance of the evidence. Here, as in other cases, Respondent argues that a special master cannot rely on the statements of the petitioner alone regarding a key element like onset. *See e.g., Juno v. Sec'y of Health & Human Servs*., No. 18-643, 2021 WL 4782691, at * 5 (Fed. Cl. Spec. Mstr. Sept. 13, 2021). But the Federal Circuit has expressly recognized that witness testimony on issues pertaining to fact matters *can* be proven by reliance on testimonial evidence (even if that testimonial evidence must be weighed against the records themselves, which continue to have evidentiary significance). *Kirby*, 997 F.3d at 1383. In this case, the relevant witness statements are not the only evidence in favor of an onset finding consistent with a Table SIRVA claim. I am therefore not "solely" relying on witness statements. At bottom, the evidence preponderates (if only barely) in favor of a determination that onset likely began in 48 hours of vaccination.

## VI. Scheduling Order

Given my findings of fact, Respondent should evaluate and provide his current position regarding the merits of Petitioner's case.

**Accordingly, the following is ORDERED:**

**(1) By <u>Tuesday, October 16, 2026,</u> Petitioner shall file all updated medical records.**

**(2) Respondent shall file, by no later than <u>Friday, October 30, 2026,</u> an amended Rule 4(c) Report reflecting Respondent's position in light of the above fact-finding.**

**IT IS SO ORDERED.**

**<u>s/Brian H. Corcoran</u>**
Brian H. Corcoran
Chief Special Master